OWEN *v.* DIX.

4-7967

196 S. W. 2d 913

Opinion delivered October 28, 1946.

*Sherrill, Cockrill & Wills*, for appellant.

*Talley, Owen & Talley, Sam Robinson* and *Tom W. Campbell*, for appellee.

HOLT, J. February 7, 1946, a jury awarded appellee damages in the amount of $7,500 to compensate an injury sustained while a passenger on one of appellant's buses, and from the judgment comes this appeal.

A number of errors have been assigned in the motion for a new trial, but only three are argued here by appellant. These alleged errors are: (1) That the evidence is not sufficient to support the verdict; (2) that the court erred in permitting Dr. Autrey to answer a certain hypothetical question, and (3) that the judgment was excessive.

### 1.

The evidence was to the following effect: April 16. 1945, appellee was a passenger on appellant's bus going into Camden when the bus "hit a concrete bridge railing and post" causing an injury to his back. His version, of how the injury occurred, was: "A. I was on the bus on the front seat on the right side, as I said, sitting next to the window. We were riding along just before we got to the Ouachita River bridge, riding along, I judge, about thirty miles an hour, that is what I judge, and all of a sudden as we had gotten on one of those bridges, there are several bridges along there, as we got on one of bridges the bus swerved over to the right hitting the railing and post real hard lick throwing me forward off the seat. . . . I was thrown from the seat forward and the bus, after the first impact, went on down sliding hitting the post. I don't know how many different bumps but from the time it bumped, after it hit the first impact, I don't remember, but after the bus stopped I was lying down on my back holding onto the rod up here (indicat-

ing). Q. Is there a rod in front there? A. Yes, sir. Q. Did you suffer any pain? A. I sure did. Q. Where? A. In my back. Q. Where in your back? A. Low down, small of my back." When the bus "struck a hard lick against the concrete banister and post of the bridge." it "peeled the metal on the outside of the bus back quite a way, broke up the floor and bent the rod in front" of appellee. He was thrown forward and the small of his back hurt, causing him great pain, which caused him to "roll and tumble that night all night long," and kept him from sleeping. He tried to work, but was unable to do so because of the severe pain in his back. He quit work, returned home, and called a doctor who referred him to Dr. Newman, who later operated on him. Prior to the injury which he received on the bus from the collision, he had always been able to work, but has been unable to do any kind of labor since the collision and injury. Dr. Newman first saw appellee on May 29, 1945, following the injury which occurred on April 16th. Another physician treated him between those dates.

On November 25th, the pain in the lower part of appellee's spine became so great that an operation was performed by Dr. Newman. Appellee has since been under observation and his progress has been "very satisfactory." Dr. Newman testified in effect that appellee had had, for a long time, perhaps from childhood, a weakened disc in the lower part of his spine that had become "rotten" that was more susceptible to a rupture than a healthy normal disc and that when appellee sustained the injury to his back in the collision, the jar "set off a condition that was present," and caused it to rupture. We quote from Dr. Newman's testimony: "He (appellee) was carried under observation because I thought at the time he did have a ruptured intervertebral disc, and judging from the nerve changes it would be at the point where the first nerve passes the lumbo-sacral joint. The first nerve root comes out between the first and second sacral where we most frequently get ruptures. X-rays were taken which verified my findings of loss of lumbar curve. The spine was pulled in in a straight row. It also showed some degeneration or absence of the disc at the lumbo-sacral

joint and probably some at the fourth inter space. It was my impression that he did have a ruptured disc. . . . Q. The rupture itself, when it actually protruded out, would that be attributable to the accident? A. We attribute that to the accident," and on cross-examination, Dr. Newman testified: "Q. The condition was that the disc had degenerated? A. It was all rotten. Q. That had been going on for some time? A. Very likely had." On re-cross examination: "Q. Condition of that kind you might say the disc was in a weakened condition from some cause or other and that would make a person more susceptible to a rupture than otherwise? A. That is right. Q. In other words, a perfectly healthy normal disc it would take a greater injury to cause a rupture than one in a weak condition? A. We find that it does; you have got a diseased condition, if you want to call it that," and on redirect examination: "Q. Then your opinion is the accident itself is what precipitated the rupture? A. It set off a condition which was present. It probably had caused him no pain. He may have had some back aches or something like that but you get a minor injury and that may set it off and from then on it usually progresses; it is a progressive type of procedure. . . . Q. I believe you say this injury as you described it would be sufficient producing cause to bring about the rupture? A. It is sufficient to open that back up and start it protruding out. Q. And cause him to be disabled where he wasn't disabled before? A. That's right."

Dr. Newman further testified: "90 per cent. of that rupture came from between the fourth and fifth lumbar and fifth lumbar and first sacral; those spaces were open on the right side. I think I got a good handful of this rotten cartilagineous material out of each of the spaces."

Dr. Autrey, in answer to the hypothetical question presently referred to, which closed with the query: "State to the jury your opinion as to what caused his present condition?" answered, "I think his accident caused it."

Under this evidence, together with all the other testimony in the case, we are unable to say that there was no question for the jury as to appellee's suffering and con-

dition having been proximately caused by the injury received while a passenger on appellant's bus.

The testimony of Dr. Newman, who performed the operation, tended to show that appellee had a diseased condition of the disc in his lower spine for a long period of time, perhaps from childhood, prior to his injury on the bus; that the disc had become weak and "rotten" and more susceptible to rupture than a normal disc, and that his bus injury "set off a pre-existing condition that was present," causing a rupture of the disc.

The rule appears to be well settled that when a defendant's negligence aggravates, or brings into activity, a dormant or diseased condition or one to which the injured person is predisposed, the defendant is liable to the injured person for the full amount of the damages which ensue, notwithstanding such diseased or weakened condition.

In 38 American Jurisprudence, p. 741, § 82, it is said: "The established rule is that where the result of an accident is to bring into activity a dormant or incipient disease, or one to which the injured person is predisposed, the negligence which caused the accident is the proximate cause of the disability, and the person responsible for the negligence is liable for the entire damages which ensue. It cannot be said that the development of the disability under such circumstances was not a consequence which might naturally follow from the injury," and in 15 American Jurisprudence, p. 490, § 81, we find: "The general rule seems to be that where the result of the accident is to bring into activity a dormant or incipient disease, or one to which the injured person is predisposed, the defendant is liable for the entire damages which ensue, for it cannot be said that the development of the disease as a result of the injury was not the consequence which might naturally or ordinarily follow as a result of the injury, and therefore the negligent person may be held liable therefor. In other words, if a latent condition itself does not cause pain, suffering, etc., but that condition plus an injury caused such pain, the injury, and not the latent condition, is the proximate cause."

This rule of law appears to be well established by our own decisions. This court in *St. Louis Southwestern Railway Company* v. *Lewis*, 91 Ark. 343, 121 S. W. 268, said: "The court gave the following instruction to the jury over the objection of the defendant: 'If you find that the defendant company in this case is liable under the instructions heretofore given, and that the plaintiff received the injuries complained of in the manner alleged, and that at the time of such injury he was predisposed to hernia, but otherwise in good health, and that such injury was solely excited or caused by his fall from the car step described in the evidence, without his fault, and that his injury, whatever you find that to be, has directly resulted therefrom, then you are instructed that the plaintiff is entitled to recover to the fullest extent of whatever you find his injuries so received to warrant, notwithstanding such predisposition or weakness of the parts in regard to hernia.' This instruction states a rule of law well sustained by the authorities." (Citing cases.)

In *St. Louis Southwestern Railway Company* v. *Smith*, 102 Ark. 562, 145 S. W. 218, we held: (Headnote 3.) "A servant is not precluded from recovering for injuries resulting in inguinal hernia, due to the negligence of a fellow-servant for which the master was liable, though plaintiff was predisposed to that disease."

Also, in *Sutton* v. *Webb*, 183 Ark. 865, 39 S. W. 2d 314, we again held: (Headnote 5.) "Where plaintiff had previously suffered from arthritis in her arm, she was entitled to recover for injury to her arm inflicted by defendant's negligence, without regard to whether the damage might not have been so great but for the arthritis."

See, also, *Safeway Stores, Inc.*, v. *Ingram*, 185 Ark. 1175, 51 S. W. 2d 985, where this court held: (Headnote 3.) "An instruction that if plaintiff was suffering with stomach trouble at the time he ate the food complained of, but the food aggravated or accentuated his condition, causing him to suffer the disorder from which he complains, defendant would be liable, held correct."

## 2.

Counsel for appellee propounded to Dr. Autrey the following hypothetical question: "If previous to the 19th day of April, 1945, the plaintiff, John E. Dix, had always been able to do hard manual labor and if on that day he was riding a bus that collided with a concrete banister of a bridge hurling plaintiff forward in a twisting manner and immediately thereafter he suffered severe pain in his back and tried to work about two days thereafter, but the pain in his back was so severe he was unable to continue his employment; that he then returned to his home in Little Rock where he contacted his family physician and about a month later was referred to Dr. Newman and Dr.Newman kept him under observance during the time and applied a brace to plaintiff's back and that plaintiff complained with pain in his back, was unable to work and on the 28th day of October, 1945, Dr. Newman operated for a ruptured disc between the fourth and fifth lumbar vertebrae and the fifth lumbar and the sacrum and Dr. Newman operated on him and that plaintiff received no other injury and plaintiff's back is sore, state to the jury your opinion as to what caused his present condition?" His answer was: "I think his accident caused it."

Appellant objected to the question in the following language: "We object to that because it is not supported by the evidence. Dr. Newman did not testify there was a ruptured disc, but he testified there was a disintegrated disc due to rottening of the disc; they haven't proven the disc was ruptured, they have merely proven this disc was disintegrated, and Dr. Newman testified it had been for a long time in the process of disintegrating."

We cannot agree with appellant's contention that this hypothetical question was improper or not supported by the evidence. Specifically, it appears that appellant's objection to the question is based upon the contention that "Dr. Newman did not testify that there was a ruptured disc." We think this contention of appellant is not borne out by the testimony of Dr. Newman, *supra*, wherein he said: "It was my impression that he did have

a ruptured disc.'' We think this testimony, together with the other testimony which he gave, would warrant a finding by the jury that appellee did have a ruptured disc.

In *Masonic Mutual Accident Company* v. *Campbell*, 156 Ark. 109, 245 S. W. 307, this court said: ''Counsel for appellant objected to the (hypothetical) question on the ground that it did not include undisputed facts, and then objected to the answer of the witness on the ground that it was not responsive to the question. We are of the opinion that each of the objections was properly overruled by the court. Appellee had introduced testimony tending to show that there was a bruised condition of Formby's toe, which had suppurated and then broken, and she was entitled to take the opinion of the expert as to whether or not this condition could have resulted from a healed wound which had become infected. All of the conditions were stated which were essential to taking the opinion of the witness on this subject, and there was no error in the form of the question.''

In *Chicago, R. I. & P. Ry. Co.* v. *Isom*, 136 Ark. 624, 203 S. W. 271, this court said: ''The hypothetical questions propounded to him assumed a state of facts to exist which the testimony in favor of the appellee tended to prove, and the appellee had a right to ask these questions from his viewpoint of the evidence,'' and in *Kansas City Southern Railway Company* v. *Akin*, 138 Ark. 10, 210 S. W. 350, this court held: (Headnote 4.) ''Hypothetical questions were proper where there was testimony tending to prove the facts on which they were based,'' and in the body of the opinion, Judge WOOD, speaking for the court, said: ''Giving the evidence its strongest probative force in favor of the appellee, which the court must do, there was testimony tending to prove the facts upon which the hypothetical questions were grounded.''

We think the question propounded to Dr. Autrey conformed to the rules above announced, and that no error appears.

### 3.

Finally, was the verdict excessive as appellant contends?

At the time of appellee's injury, he was 39 years of age, had always enjoyed good health, was able to work and had a life expectancy of 28 years. For some time prior to the injury, he had been earning approximately $3,000 per year and had been unable to work from the time of his injury, April 19, 1945. His hospital and medical expenses were approximately $760. The operation was a most serious one and obviously major in charter. Appellee's complete recovery is doubtful. Dr. Autrey testified: "I don't believe this patient will ever completely recover from this injury."

When these facts, along with other evidence, are taken into account by the jury, as was their right, we are unable to say that the verdict returned was excessive.

On the whole case, finding no error, the judgment is affirmed.